**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

**KATHERINE GREEN,** an individual

Plaintiff,

v.

**THE CITY OF AURORA, COLORADO**, a municipality

Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Katherine Green, through her undersigned counsel, submits this Complaint and Jury Demand against the City of Aurora, and in support of states as follows.

## PARTIES

1. Plaintiff Katherine Green ("**Plaintiff**" or "**Ms. Green**") is an individual who, at all times relevant to this action, resided at 2098 Kenton Street, Aurora, Colorado 80010.

2. The City of Aurora ("**Defendant**" or the "**City**") is a home-rule municipality and a municipal corporation of the State of Colorado under the Colorado Constitution, Article XX.

3. At all times relevant to this action, beginning in 2021, Plaintiff worked for the City of Aurora as a Senior Marketing Strategist.

4. At all relevant times, the City was Plaintiff's employer within the meaning of the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008

(together, the "**ADA**") and the Colorado Anti-Discrimination Act ("**CADA**"). See 42 U.S.C. §§ 12101, *et seq*.; Colo. Rev. Stat. § 24-34-401, *et seq*.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over Ms. Green's claims pursuant to 28 U.S.C. § 1331. This action is authorized by, and instituted under the ADA.

6. Plaintiff requests this Court exercise supplemental jurisdiction over her claims under Colorado law pursuant to 28 U.S.C. § 1367, as those claims arise from the same case and controversy as the claims over which this Court has original jurisdiction.

7. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because at all times relevant to the claims herein, Ms. Green resided and performed work for the City within this judicial district.

8. On May 22, 2024, Plaintiff sent the City a Colorado Governmental Immunity Act ("**CGIA**") Notice of Claims Pursuant to Colo. Rev. Stat. § 24-10-109 via certified mail, notifying the City of her claims. More than ninety (90) days have elapsed since the notice was sent.

## ADMINISTRATIVE PROCEDURES

9. On or about March 26, 2024, Ms. Green filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**") and the Colorado Civil Rights Division ("**CCRD**"), related to discrimination based on disability.

10. In support of her Charge of Discrimination, Ms. Green named her supervisor, Marketing and Creative Manager Lara Ray ("**Ms. Ray**"), Director of Communications Kim

Stuart ("**Ms. Stuart**"), and Human Resources Director Ryan Lantz ("**Mr. Lantz**"), as the main perpetrators of the City's unlawful conduct.

11. On January 16, 2025, the CCRD issued a Notice of Right to Sue letter authorizing Ms. Green to bring the present lawsuit.

12. On or about February 5, 2025, the U.S. Department of Justice issued a Determination and Notice of Rights to Ms. Green, which included a Notice of Suit Rights authorizing Ms. Green to bring the present lawsuit.

13. Plaintiff files this Complaint and Jury Demand within 90 days of receipt of her Right to Sue letters.

14. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADA and CADA.

## GENERAL ALLEGATIONS

### *Ms. Green's Disability*

15. At all times relevant hereto, Ms. Green has been diagnosed with Bipolar I Disorder, a chronic and episodic psychiatric condition that substantially limits her major life activities during flare ups and episodes, including the ability to work, concentrate, sleep, and care for herself.

### *Employer and Employee Information*

16. The City is an employer pursuant to the ADA and CADA, and at all times material hereto has employed fifteen or more employees.

17. On July 5, 2021, Ms. Green began her employment with the City as a Senior Marketing Strategist, reporting to Ms. Ray, the City's Marking and Creative Manager.

18. At all times relevant hereto, Ms. Green satisfied the required skill, experience, education or other job-related requirements for her position as Senior Marketing Strategist and could perform the essential functions of her position.

19. Ms. Green's position was a hybrid work from home role, which allowed her some flexibility with regard to working in the office or from home when not attending special events.

20. Ms. Green performed her job at a high level, received merit-based bonuses, and was praised in performance evaluations.

21. Prior to suffering discriminatory and hostile treatment from Ms. Ray, as alleged below, Ms. Green's medical impairment had been well managed for over 20 years with consistent treatment and without the need for accommodation or workplace leave.

22. Ms. Green was able to perform her duties with great success when she worked from home and when she had limited in-person interactions with Ms. Ray.

***Ms. Ray's Hostile Behavior and Micromanaging***

23. Despite Ms. Green's clear success in her role, when interacting with Ms. Green, Ms. Ray regularly exhibited a hostile, erratic, and micromanaging supervisory style that included yelling, mistrust, accusations, and the imposition of unrealistic expectations with no real business purpose, which created an unprofessional and tense atmosphere.

24. Ms. Ray also repeatedly called Ms. Green at unscheduled times during her remote work hours — sometimes more than ten times per day — not for time-sensitive issues but for unnecessary "check-ins," often extending into non-working hours.

25. These constant impromptu interruptions resulted in substantial disruption to Ms. Green's focus, productivity, and mental health.

26. Ms. Ray consistently undermined Ms. Green's work by belittling her in front of colleagues and issuing contradictory or last-minute directions.

27. Ms. Green attempted to mitigate the stress caused by Ms. Ray's micromanagement by proposing they have regularly scheduled meetings in order to effectively consolidate Ms. Ray's feedback into predictable scheduled calls.

28. While Ms. Ray accepted the calendar invites for these meetings, she continued to pepper Ms. Green multiple times a day with interruptions and calls that negatively impacted Ms. Green's productivity and ability to focus, and exacerbated her anxiety and symptoms of her bipolar disorder.

29. Ms. Ray refused to respect Ms. Green's requests for focused supervision rather than sporadic off-schedule disruptions, and Ms. Ray seemed to intentionally escalate her intrusive behavior toward Ms. Green after Ms. Green disclosed that her mental health was being negatively impacted.

***Impact of Hostile Supervision on Ms. Green's Mental Health***

30. Ms. Green felt the psychological effects of Ms. Ray's micromanagement and hostility both during and after working hours, suffering from severe anxiety, panic attacks, and difficulty sleeping.

31. Ms. Green was frequently left in tears at the end of the workday due to the intensity of Ms. Ray's scrutiny and unpredictable mood swings.

32. In May 2022, Ms. Green was physically injured at a City-sponsored event. Ms. Green's request to work from home while she recovered was approved without incident.

33. In early summer 2022, when Ms. Ray went on parental leave, Ms. Green reported a notable improvement in her mental health and productivity, which confirmed the direct negative impact Ms. Ray's management style had on her mental health.

34. There was no question that Ms. Ray's aggressive and hostile interactions with Ms. Green exacerbated Ms. Green's bipolar symptoms and impairments.

35. Upon learning that Ms. Ray would be returning from leave in September 2022, Ms. Green experienced an extreme panic attack and immediately requested a meeting with Ms. Ray's supervisor, Kim Stuart ("**Stuart**"), Director of Communications.

36. In this meeting, Ms. Green disclosed the severe mental and physical toll that Ms. Ray's conduct had taken on her health. Ms. Stuart acknowledged that similar complaints had been raised by other employees about Ms. Ray, but the City failed to take any corrective or remedial steps.

37. Ms. Stuart promised to speak with Ms. Ray about Ms. Green's concerns, but Ms. Green saw no evidence that this ever occurred.

38. After Ms. Ray returned from her parental leave, the toxic work environment resumed, and Ms. Green's symptoms worsened, including loss of sleep, inability to concentrate, and renewed panic attacks.

39. Ms. Green began weekly therapy sessions in early 2023 as a direct result of the hostile work environment created by Ms. Ray. The purpose of these therapy sessions, as documented by her licensed mental health provider, was to address the chronic stress and anxiety she experienced at work.

40. Due to the severity of her symptoms, Ms. Green's treatment team increased her medications for anxiety in 2023.

41. Ms. Green was prescribed Propranolol, a beta blocker, to manage acute anxiety episodes; Buspirone, an anxiolytic for chronic anxiety; and Clonazepam, a benzodiazepine, which she frequently used to calm down before sleep when she became especially agitated due to work stress.

42. Ms. Green again raised concerns to Ms. Stuart in December 2022, April 2023, and May 2023, each time hoping to resolve the situation through internal reporting. No intervention was made.

43. Ms. Ray continued her behavior by openly criticizing Ms. Green during staff meetings, undermining her authority, and needlessly escalating minor issues, all of which increased Ms. Green's stress and bipolar symptoms.

44. In June 2023, Ms. Green's symptoms significantly worsened, including debilitating anxiety, insomnia, inability to eat, and cognitive dysfunction such that she could no longer perform basic or major life activities when forced to work along side Ms. Ray.

45. Ms. Green's family and treatment providers urged her to take medical leave to avoid a further psychiatric crisis.

***Ms. Green's Medical Deterioration and the Need for FMLA Leave***

46. On June 26, 2023, Ms. Green formally initiated a request for leave under the Family and Medical Leave Act ("**FMLA**").

47. Her therapist submitted documentation to the City's third-party administrator, Voya, stating that Ms. Green's work environment had contributed significantly to the exacerbation of her Bipolar Disorder and that extended medical leave was medically necessary.

48. Ms. Green's treating psychiatrist further confirmed that she was suffering from "severe symptoms of bipolar affective disorder," including the inability to perform "basic cognitive function due to anxiety and depression."

49. Ms. Green was ultimately approved for FMLA leave for her serious medical condition, which began as probationary on June 26, 2023, and officially ran from July 11, 2023 through November 5, 2023.

50. During her FMLA leave, Ms. Green had significant medical improvement, largely due to her physical and psychological distance from Ms. Ray.

51. Ms. Green's need to take FMLA leave was the direct and proximate result of her supervisor's escalating harassment, the City's failure to intervene despite multiple internal complaints and pleas to Ms. Stuart, and the psychological toll of working in a hostile environment for an extended period.

52. Nearing the conclusion of her FMLA leave, on November 1, 2023, Ms. Green's treating physician determined she was well enough to return to work, but only if permitted to transition back to the in-person days of her hybrid schedule gradually and specifically, being permitted to work remotely full-time just through the end of December.

***Ms. Green's Request for Reasonable Accommodation and Remote Work***

53. On November 1, 2023, Ms. Green formally notified the City of her readiness to return and submitted a request for a reasonable accommodation under the ADA to work remotely full-time through December 31, 2023, or until her physician indicated otherwise.

54. Ms. Green's request was relatively modest in scope, as she previously worked remotely three days per week under the City's hybrid work model and only sought to work from home two additional days per week for the remaining eight weeks of the year (a request seeking only 16 remote workdays).

55. Ms. Green submitted documentation from her physician supporting the need for this reasonable accommodation, citing the serious psychological risk associated with returning in person to the hostile workplace environment prematurely.

56. Ms. Green's medical records and communications with her treatment providers made clear that in-person exposure to Ms. Ray and the office environment would likely trigger renewed psychiatric episodes.

57. Despite the clarity and urgency of the medical documentation, the City failed to make a timely decision or offer any interim accommodations.

58. From November 1, 2023 to December 29, 2023, Ms. Green remained medically cleared to return to work remotely, but was not permitted by the City to work in any capacity (not even for her three regularly scheduled remote work days per week).

59. During this time, Ms. Green was forced into involuntary unpaid leave solely due to the City's delay in processing or responding to her ADA accommodation request.

60. On November 13, 2023, Ms. Green submitted the City's required ADA accommodation form completed by her physician.

61. After receiving this paperwork, the City waited approximately one week to send a follow-up questionnaire to Ms. Green's physician via regular mail.

62. Ms. Green's physician never received the mailed follow-up form.

63. When Ms. Green was finally able to obtain an electronic copy of the document from the City more than a month later, she provided the electronic form to her doctor herself, and he completed and returned it the same day, December 15, 2023.

64. Despite this swift turnaround, the City delayed responding again, and waited another full week to send yet another round of follow-up questions to Ms. Green's doctor.

65. Ms. Green's physician, while unfamiliar with the legal definition of disability under the ADA, clearly explained that Ms. Green experienced "intense anxiety" and "extreme difficulty focusing" in the workplace setting based on her bipolar disorder.

66. These symptoms are textbook limitations on major life activities, including the ability to work and concentrate.

***Denial of ADA Request***

67. Nonetheless, on December 29, 2023, the City formally denied Ms. Green's ADA accommodation request.

68. The denial was issued without any offer of alternative accommodations, without good faith engagement in the interactive process, and without any meaningful discussion with Ms. Green.

69. The City may have misinterpreted her physician's statements, but they made no further good faith inquiry, which the ADA requires.

70. The City's denial was delivered just two business days before the requested accommodation period would have ended.

71. The City's Director of Human Resources, Mr. Lantz, informed Ms. Green that, based on her physician's responses, she was "not considered 'disabled' under the ADA criteria."

72. Mr. Lantz falsely claimed that Ms. Green's physician had "clarified" that she did not have any impairment in a major life activity, which directly contradicted the physician's statements.

73. Ms. Green's physician said:

a. "[Ms. Green] get's intense anxiety in the work-place and has extreme difficulty with focus at the work-place" (all sic);

b. "I am personally not familiar with Americans with disabilities act and how this may or may not apply to Ms. Green" (all sic);

c. "In my judgment (whether she meets criteria for a disability) is a more of a legal question than a medical one;"

d. "My quick review of the ADA suggests she may not have an impairment in one of her major life activities;" and finally,

e. "Perhaps a legal consultation would be helpful."

74. Nowhere did Ms. Green's physician state that she was not impaired — only that the legal determination of "disability" under the ADA was outside his professional purview.

75. The City provided no alternative accommodations, offered no discussion of potential modifications, and never proposed a compromise to Ms. Green's original request.

76. The City failed to consider Ms. Green's proven history of productivity while working remotely under the existing hybrid work from home model and ignored the fact that in 2022, Ms. Green worked fully remotely for weeks while recovering from a physical injury.

77. Despite Ms. Green's repeated and clear communication that she was able and eager to return to work immediately, she was denied that opportunity, and forced into involuntary unpaid leave while the City unreasonably stalled.

78. The City refused to grant even a temporary or interim work-from-home arrangement during its protracted bad faith review of the ADA accommodation request, compounding the harm to Ms. Green's financial and emotional well-being.

79. The delay and denial occurred even though the City had no evidence of undue hardship and had never conducted a formal undue hardship analysis as required by the ADA.

80. The City also never engaged in the required interactive process with Ms. Green, instead treating her ADA accommodation request as a one-sided administrative burden to be disposed of with delay and eventual denial.

81. The ADA requires employers to engage in good faith, individualized consideration of accommodation requests. The City failed to do so, instead issuing a categorical and conclusory rejection.

82. By delaying action for nearly two months, intentionally misinterpreting her physician's reservations about making legal conclusions, refusing any interim or modified accommodations, and denying the reasonable accommodation request outright without exploring

alternatives and without conducting any undue hardship analysis, the City violated Ms. Green's rights under the ADA.

***Ms. Green's Return to Work***

83. Despite knowing that the environment had triggered debilitating symptoms in the past and had been the sole catalyst for her FMLA leave, Mr. Lantz instructed Ms. Green to return to work.

84. Mr. Lantz failed to provide any clear guidance or written directives regarding the terms, timeline, or expectations for Ms. Green's return to work.

85. In an effort to comply and demonstrate good faith, Ms. Green logged in remotely for the department's daily 8:30 AM Communications meeting on Tuesday, January 2, 2024, the first business day following the New Year.

86. Throughout the day, Ms. Green remained logged in, responsive, and available. She proactively provided updates to both Ms. Ray and Ms. Stuart approximately every two hours, cleared a backlog of emails, and otherwise performed her duties as reasonably expected of someone reintegrating into the workplace.

87. Upon her return, Ms. Green immediately observed that her job duties had been significantly diminished.

88. The core projects and responsibilities she previously held had been transferred to two independent contractors hired during her medical leave—an arrangement that demonstrated remote work or even a temporary reassignment was both feasible and already in place.

89. Instead of reinstating her into her former role, Ms. Green was assigned menial and disconnected tasks by Ms. Ray, tasks that did not utilize her skills or reflect her Senior Strategist title.

90. Prior to Ms. Green's FMLA leave, she worked in office on Tuesdays and Wednesdays, which limited her in-person interactions with Ms. Ray to one day per week.

91. Upon her return to work, Ms. Ray told Ms. Green she was required to work in the office on Tuesdays and Thursdays, the same in-office days as Ms. Ray.

92. When Ms. Green attempted to adjust her office hours to 7:00 a.m. to 3:00 p.m., Ms. Green was told that she was expected to be present from 7:00 a.m. to 4:00 p.m., a 45-hour workweek, which was inconsistent with the City's standard schedule, and not similarly required of her peers.

93. This change in hours, combined with the reassignment of responsibilities and schedule manipulation, constituted a material and retaliatory alteration in the terms and conditions of her employment.

94. Ms. Green began experiencing a rapid decline in her mental health and return of her symptoms almost immediately upon returning to the workplace, which included anxiety and panic attacks.

95. During this period, Ms. Green was taking Propranolol up to four times a day simply to endure her time in the office. Although not prescribed for this frequency of use, she was under such extreme psychological duress that she relied on the medication to function in the work environment.

96. When she informed her attending physician of this usage, he expressed immediate concern and instructed her to discontinue that level of intake, warning her that the dosage could dangerously slow her heart rate.

97. One particularly alarming incident occurred towards the end of Ms. Green's employment with the City, when she took two mg. tablets of Clonazepam in an attempt to calm herself and sleep. The sedative effect was so strong that she slept through multiple alarms and phone calls from her mother the following morning.

98. Concerned, her mother drove to Ms. Green's home and found her still asleep, unresponsive even to loud calls of her name inside the house. The experience left Ms. Green feeling unstable and unsafe, prompting her to stay at her parents' home for supervision and support. She immediately scheduled an emergency consultation with her physician to address the situation and review her treatment plan.

99. Despite these escalating symptoms and the clear warning signs they represented, the City made no effort to revisit or revise its denial of Ms. Green's reasonable accommodation request to work remotely full-time, nor did it attempt to reengage in the interactive process in good faith.

100. Ms. Green again notified her treatment providers of the worsening condition and her fear that remaining in the workplace would cause permanent damage to her mental and physical health.

101. On January 25, 2024, following another medical evaluation, her physician increased her psychiatric medications due to the renewed symptoms, including elevated heart rate, insomnia, and inability to concentrate.

102. Ms. Green's treatment team determined that continuing in the current work environment would jeopardize her safety, worsen her illness, and risk a severe psychiatric episode or hospitalization.

103. After careful consultation with her providers and her family, Ms. Green concluded that returning to work under the hostile, isolating, retaliatory, and medically dangerous conditions was neither tenable nor safe.

104. On January 26, 2024, Ms. Green formally notified the City that she was being forced to resign from her position due to the City's failure to accommodate her disability, the retaliation she was experiencing for exercising her FMLA rights, and the intolerable, medically unsafe working conditions she was subjected to upon her return.

105. Ms. Green was constructively discharged as a direct result of the City's conduct, which left her with no reasonable alternative but to remove herself from the environment for the sake of her health, safety, and life.

106. A reasonable person in Ms. Green's position – someone facing severe mental health deterioration, humiliation, retaliatory job changes, and bad faith denial of medically necessary and reasonable accommodations – would have no choice by to resign.

107. Ms. Green continues to suffer from emotional distress, psychiatric and psychological harm, career disruption, and financial hardship directly caused by the City's actions and omissions alleged herein.

**FIRST CLAIM FOR RELIEF**
**Violation of the ADA and CADA – Failure to Engage in the Interactive Process and Unreasonable Delay in Processing Accommodation Request**

108. Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

109. At all times relevant hereto, the City was and is subject to the ADA and CADA.

110. At all times relevant hereto, Ms. Green was an individual with a disability within the meaning of the ADA and CADA, having been diagnosed with Bipolar I Disorder, which is a mental impairment that substantially limits one or more major life activities, including the ability to work, concentrate, eat, sleep, and care for oneself.

111. The City knew or should have known of Ms. Green's disability as early as July 2023, when Ms. Green applied for and was granted FMLA leave based on documentation from her licensed mental health provider and treating physician regarding her mental health diagnosis.

112. At all times relevant hereto, Ms. Green satisfied the required skill, experience, education or other job-related requirements for her position as Senior Marketing Strategist and could perform the essential functions of her position, with reasonable accommodation.

113. Ms. Green performed her job at a high level, received merit-based bonuses, and was praised in performance evaluations.

114. Ms. Green was able to perform her duties with great success when she worked from home and when she had limited in-person interactions with Ms. Ray.

115. On November 1, 2023, Ms. Green submitted a formal request for a reasonable accommodation under the ADA and CADA, seeking to work remotely through December 31,

2023, in order to safely return to work after her FMLA leave and maintain her mental health stability.

116. Ms. Green was medically cleared to return to full-time work with the reasonable accommodation of full-time remote work. Her request was supported by her treating provider's written recommendation.

117. Upon receiving the reasonable accommodation request and supporting documentation on November 13, 2023, the City was obligated to engage in an individualized, good faith interactive process with Ms. Green and her provider to determine whether the requested accommodation could be granted or whether any alternative accommodations might be appropriate.

118. The City failed to engage in the interactive process and unreasonably delayed the processing of Ms. Green's accommodation request when it:

a. Delayed initiating any timely or meaningful dialogue with Ms. Green for several weeks after receiving her accommodation request;

b. Mailed a follow-up medical questionnaire to Ms. Green's provider, despite knowing the provider preferred electronic communication, resulting in the form never being received;

c. Forced Ms. Green to personally intervene to obtain and submit the form electronically, which her provider returned the same day — December 15, 2023;

d. Waited an additional week — until December 22, 2023 — to send further follow-up questions to Ms. Green's physician, despite knowing the accommodation period was nearly over;

e. Issued a summary denial of Ms. Green's request on December 29, 2023, 53 days after the request was made, by which time nearly the entire requested accommodation period had already passed;

f. Failed to schedule or propose a meeting with Ms. Green to discuss the request or consider reasonable alternatives;

g. Failed to conduct a functional job analysis to assess which duties, if any, required in-person performance;

h. Did not consult Ms. Green's supervisor, coworkers, or relevant personnel to determine the feasibility of continued remote work;

i. Refused to allow Ms. Green to return to work in any capacity while the accommodation request was under review — including her prior, successful three-day hybrid schedule;

j. Declined to offer or explore any interim or temporary accommodations during the pendency of the review, despite Ms. Green's willingness to cooperate;

k. Never documented or asserted that Ms. Green's requested accommodation would pose an undue hardship to the City;

l. Failed to provide any written explanation of why the requested accommodation was allegedly infeasible;

m. Mischaracterized and intentionally misinterpreted Ms. Green's physician's statements, falsely asserting that she had no impairment in major life activities and was not disabled under the ADA;

n. Ignored Ms. Green's well-documented Bipolar I Diagnosis and history of treatment, which was clearly supported by medical records and a recent approved FMLA leave for the same serious medical condition;

o. Engaged in a pattern of delay, miscommunication, and non-responsiveness that undermined the required individualized, good-faith interactive process; and

p. Demonstrated bad faith by refusing to collaborate with Ms. Green, ignoring multiple attempts by her to engage, and denying her the opportunity to return to work under medically appropriate conditions.

119. The City's conduct was willful, malicious, and carried out with reckless disregard for Ms. Green's federally and state-protected rights.

120. As a result of the conduct as above alleged, Plaintiff has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, liquidated and/or punitive damages as permitted by law, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF
## Violation of the ADA and CADA - Failure to Accommodate

121. Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

122. At all times relevant hereto, the City was and is subject to the ADA and CADA.

123. At all times relevant hereto, Ms. Green was an individual with a disability within the meaning of the ADA and CADA, having been diagnosed with Bipolar I Disorder, which is a mental impairment that substantially limits one or more major life activities, including the ability to work, concentrate, eat, sleep, and care for oneself.

124. The City knew or should have known of Ms. Green's disability as early as July 2023, when Ms. Green applied for and was granted FMLA leave based on documentation from her licensed mental health provider and treating physician regarding her mental health diagnosis.

125. At all times relevant hereto, Ms. Green satisfied the required skill, experience, education or other job-related requirements for her position as Senior Marketing Strategist and could perform the essential functions of her position, with reasonable accommodation.

126. Ms. Green performed her job at a high level, received merit-based bonuses, and was praised in performance evaluations.

127. Ms. Green was able to perform her duties with great success when she worked from home and when she had limited in-person interactions with Ms. Ray.

128. On November 1, 2023, Ms. Green submitted a formal request for a reasonable accommodation under the ADA and CADA, supported by her treating physician. She requested a temporary, time-limited modification to her hybrid schedule to allow full-time remote work through December 31, 2023 — less than two months — in order to support her transition back to work and prevent recurrence of severe symptoms.

129. This request was reasonable on its face. Ms. Green had successfully worked remotely during prior periods. Her job duties could be and had been performed from home with no loss in productivity or work quality.

130. Ms. Green's request would not have imposed an undue hardship on the City. In fact:

a. The City had already contracted with two outside vendors to perform aspects of her role during her medical leave.

b. The Communications Department regularly operated under flexible and hybrid schedules.

c. The City permitted remote work for numerous employees in comparable roles.

131. Despite this, the City did not grant Ms. Green's requested accommodation, nor did it offer a modified or alternative accommodation.

132. Instead, the City denied the accommodation request on December 29, 2023.

133. At no time did the City assert or document that Ms. Green's requested accommodation posed an undue hardship, nor did it provide any specific explanation as to why her requested temporary remote work schedule was infeasible.

134. The City did not conduct any individualized assessment of Plaintiff's job functions or workplace limitations, nor did it engage in a collaborative or flexible approach to identify a workable accommodation.

135. The City falsely claimed that Ms. Green's doctor stated she was not disabled under the ADA — a legal conclusion her doctor expressly disclaimed making.

136. Ms. Green's physician documented that she experienced "intense anxiety" and "extreme difficulty focusing" in the office, and that remote work was medically necessary as a result of her documented medical condition.

137. The City's misrepresentation was used to summarily dismiss her eligibility for protection under the ADA and CADA, despite the clear and longstanding nature of her condition and the extensive documentation previously provided.

138. The denial was not the result of any legitimate analysis, and the City made no effort to accommodate Ms. Green's disability in any meaningful or good-faith manner.

139. As a result of the City's failure to provide a reasonable accommodation, Ms. Green was forced to return to an office environment that had previously triggered a serious decline in her mental health, and where she faced escalating retaliation and exclusion.

140. Ultimately, this refusal to accommodate her disability contributed directly to Ms. Green's constructive discharge on January 26, 2024.

141. The City's actions constitute a violation of both the ADA and CADA.

142. The City's conduct was willful, malicious, and carried out with reckless disregard for Ms. Green's federally and state-protected rights.

143. As a result of the conduct as above alleged, Ms. Green has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, liquidated and/or punitive damages as permitted by law, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## THIRD CLAIM FOR RELIEF

**Violation of the Family and Medical Leave Act – Failure to Reinstate**

144. Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

145. At all times relevant hereto, the City was and is subject to the FMLA and is an employer under the FMLA.

146. At all relevant times, Ms. Green was an eligible employee under the FMLA, having been employed by the City for more than twelve months and having worked at least 1,250 hours during the twelve-month period preceding her leave.

147. In June 2023, Ms. Green, upon the recommendation of her licensed psychiatrist and therapist, applied for and was granted protected medical leave under the FMLA due to her serious health condition, Bipolar Disorder and its severe symptoms, including anxiety and depression.

148. Ms. Green's FMLA leave was certified by her healthcare providers, supported by medical documentation, and approved by the City and its third-party administrator, Voya.

149. Ms. Green took leave from approximately June 26, 2023, through November 5, 2023. Throughout that time, she remained in communication with the City and its agents regarding her status, her medical treatment, and her intention to return to work.

150. Prior to taking FMLA leave, Ms. Green performed her job at a high level, received merit-based bonuses, and was praised in performance evaluations.

151. Ms. Green satisfied the required skill, experience, education or other job-related requirements for her position as Senior Marketing Strategist and could perform the essential functions of her position.

152. When Ms. Green returned from FMLA leave, instead of resuming her previous job responsibilities upon her return, Ms. Green discovered that two independent contractors had taken on her main work responsibilities, leaving her menial tasks assigned by Ms. Ray.

153. Ms. Ray had reassigned the core responsibilities of Ms. Green's Senior Marketing Strategist role to these two independent contractors who remained employed and doing Ms. Green's work even after Ms. Green's return.

154. Ms. Ray assigned only menial, administrative, and lower-level tasks to Ms. Green upon her return to work, inconsistent with her prior duties and expertise.

155. The FMLA gives an employee the right following FMLA leave to be returned to the position held when the leave began or to an equivalent position.

156. The City failed to reinstate Ms. Green back to the position with the duties and responsibilities she held prior to her FMLA leave upon her return.

157. Further, the City changed the 40 hour per week position she held prior to her FMLA leave to a 45 hour per week position upon her return, without an increase in pay or benefits.

158. In direct contravention of the FMLA's mandate that employees return to their original position or an equivalent job after their leave, the City instead (after significant delay) reinstated Ms. Green without returning her main job duties to her and then mandated an additional five hours of week beyond what other City employees were expected to work.

159. The City's actions constitute a violation of the FMLA.

160. Ultimately, this violation of Ms. Green's right to be reinstated to the position she held prior to her FMLA leave contributed directly to Ms. Green's constructive discharge on January 26, 2024.

161. The City's conduct was willful, malicious, and carried out with reckless disregard for Ms. Green's federally protected rights.

162. As a result of the conduct as above alleged, Ms. Green has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, liquidated and/or punitive damages as permitted by law, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## FOURTH CLAIM FOR RELIEF
## Violation of the Family and Medical Leave Act – Retaliation

163. Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

164. At all times relevant hereto, the City was and is subject to the FMLA and is an employer under the FMLA.

165. At all relevant times, Ms. Green was an eligible employee under the FMLA, having been employed by the City for more than twelve months and having worked at least 1,250 hours during the twelve-month period preceding her leave.

166. In June 2023, Ms. Green, upon the recommendation of her licensed psychiatrist and therapist, applied for and was granted protected medical leave under the FMLA due to her serious health condition, Bipolar Disorder and its severe symptoms, including anxiety and depression.

167. Ms. Green's FMLA leave was certified by her healthcare providers, supported by medical documentation, and approved by the City and its third-party administrator, Voya.

168. Ms. Green took leave from approximately June 26, 2023, through November 5, 2023. Throughout that time, she remained in communication with the City and its agents regarding her status, her medical treatment, and her intention to return to work.

169. Prior to her leave, Ms. Green had consistently performed at a high level, receiving merit bonuses, strong performance evaluations, and positive feedback. Her position included substantial responsibilities and creative autonomy.

170. In anticipation of her return, Ms. Green's treating physician cleared her to return to work on November 5, 2023, with a medical recommendation for a temporary remote work accommodation, which the City later denied.

171. The City retaliated against Ms. Green following her protected FMLA leave by materially altering the terms and conditions of her employment upon her return to work, including but not limited to:

a. Reassigning the core responsibilities of her Senior Marketing Strategist role to two independent contractors;

b. Assigning only menial, administrative, and lower-level tasks inconsistent with her prior duties and expertise;

c. Changing Ms. Green's in-office work schedule from Tuesdays and Wednesdays to Tuesdays and Thursdays, directly aligning with the in-office days of Ms. Ray, the supervisor whose conduct contributed to Plaintiff's need for leave;

d. Requiring Plaintiff to work from 7:00 a.m. to 4:00 p.m., thereby extending her workday by one hour and increasing her workweek to 45 hours — a condition not imposed on similarly situated employees.

172. These materially adverse employment actions occurred immediately upon Ms. Green's return and followed a months-long leave for a serious medical condition, creating a strong temporal inference of retaliatory animus.

173. The City offered no business justification or policy-based rationale for these changes.

174. Ms. Green was never informed of any performance-related concerns nor given an opportunity to resume her previous responsibilities.

175. The altered conditions of employment made clear that Plaintiff was no longer welcomed or supported by the City. These changes were designed to force Ms. Green into failure or departure.

176. Ms. Green made good faith attempts to resume her employment and comply with the new conditions. However, within weeks, her mental health deteriorated due to the re-exposure to workplace stressors, lack of support, and retaliatory environment.

177. With the support of her treatment providers, Ms. Green determined that her health and safety were at risk if she continued working under the City's imposed conditions and retaliatory environment.

178. On January 26, 2024, she submitted notice of her constructive discharge.

179. The City's conduct constitutes unlawful retaliation in violation of the FMLA.

180. The City's conduct was willful, intentional, and carried out in knowing disregard of Plaintiff's federally protected rights.

181. As a result of the conduct as above alleged, Ms. Green has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages for back pay, front pay, lost job benefits, damages for emotional distress and pain and suffering, liquidated and/or punitive damages as permitted by law, reasonable attorneys' fees and costs, and pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment in her favor and against the City of Aurora as follows:

a. Economic damages, including without limitation, lost wages, lost benefits and out-of-pocket medical expenses;

b. Non-economic damages for emotional distress;

c. Punitive and/or liquidated damages as permitted by law;

d. Front pay;

e. Reasonable attorneys' fees and costs;

f. Pre- and post-judgment interest; and

g. Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: April 15, 2025.

By: /s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot, #35723
Ruth A. McLeod, #58702
THE LITIGATION BOUTIQUE LLC
78 West 11th Avenue
Denver, Colorado 80204
T: 303.355.1942
F: 303.355.2199
Email: lvanlandschoot@thelitbot.com
Email: rmcleod@thelitbot.com
**ATTORNEYS FOR PLAINTIFF KATHERINE GREEN**

**Plaintiff's Address:**
2098 Kenton Street
Aurora, Colorado 80010